Filed 10/6/22  P. v. Stokes CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074158 |
| v. | (Super. Ct. No. FSB1402378) |
| TRAVON LEWIS STOKES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  David Mazurek, Judge.  Affirmed in part, reversed in part.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Senson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant and appellant Travon Stokes shot and killed three people in a lounge's parking lot. A witness said defendant yelled the name of his gang before shooting the victims. Defendant claimed he was repeating the lyrics to a rap song he had heard just before the shooting. A jury convicted defendant of three counts of murder and found true several special circumstances, including that he committed the murders for the benefit of his gang. The trial court sentenced defendant to a term of 25 years to life plus a term of life without the possibility of parole.

Defendant argues the jury committed misconduct because they discussed whether the rap song was released after the shootings even though there was no evidence of its release date. He also argues there is insufficient evidence to support the jury's finding that he committed the murders for the benefit of his gang and that the trial court erroneously imposed fines and fees. Defendant alternatively argues that the jury's true findings on the gang enhancements must be vacated and the matter remanded for retrial under recent changes to the applicable law. Finally, defendant argues he is entitled to a new trial and that his convictions must be reversed under new legislation that applies retroactively.

We agree that the jury's true findings on the gang enhancements must be vacated and remanded for retrial, but we reject defendant's remaining contentions. We therefore vacate the true findings on the gang enhancements and remand the matter for retrial on only those enhancements under the new law, if the People elect to retry them. In all other respects, the judgment is affirmed.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2014, defendant, the victims, and others were drinking, dancing, and smoking at a hookah lounge. When the lounge closed, they went outside and continued drinking and dancing in the parking lot. S.C. and L.C. were sitting in L.C.'s car. The victims, Terry Freeman, David Lawler, and Kavin Johnson, and their friend, D.F., were standing near L.C.'s car and talking to her and S.C. Defendant was standing next to his car two parking spots away. The group was laughing and having fun.

While talking to Freeman, D.F. noticed that defendant was staring at them angrily. Defendant thought the group was laughing at him and disrespecting him. Defendant stepped toward them and said something along the lines, "'who are you staring at?'" and "why [are] you laughing?" According to D.F., defendant then immediately said, "'Hoover,'" and shot Freeman in the face. Defendant denied that he said "'Hoover'" before shooting Freeman, although he testified that he yelled ""Hoover'" inside the lounge while singing along to a rap song by rapper R.J. that includes the lyric, "'Crips, Hoovers, and Bloods.'"

3

After defendant fired the shots, D.F. ran away and the crowd in the parking lot scattered. As the crowd ran away, defendant shot Johnson and Lawler, then drove away. Freeman, Johnson, and Lawler died from their wounds.

A jury convicted defendant of three counts of murder (Pen. Code, § 187, subd. (a)).[1] As to each count, the jury also found true that defendant killed the victim by personally and intentionally discharging a firearm (§ 12022.53, subd. (d)) and that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury also found true a multiple-murder special circumstance (§ 190.2, subd. (a)(3)). The trial court sentenced defendant to a term of 25 years to life plus life without the possibility of parole. The court also imposed a $10,000 restitution fine (§ 1202.4) and $210 in court security and facilities fees (§ 1465.8; Gov. Code, § 70373).

## III.

## DISCUSSION

A. *Jury Misconduct*

1. *Background*

Defendant was tried and convicted in December 2017. During the jury's first day of deliberations, they sent a note to the trial court asking, "When was the RJ Rapper song released that referenced Hoovers, Crips + Bloods?" The trial court responded, "You are limited to what was introduced as evidence in trial. Please do not do any independent

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

4

investigation."

About six months later, defendant's trial counsel's supervisor, Richard La Fianza, filed a petition to release juror contact information (Code of Civil Procedure section 237, subd. (b)). La Fianza explained that he spoke with the jurors after the verdict and they said that the rap song was not released until after 2014. According to La Fianza, "[o]ne female juror stated that they, the jury, as a whole was confused on this issue but that they had a resident rap expert on the jury."

The trial court denied defendant's petition. In February 2019, however, the trial court granted defendant's motion for an evidentiary hearing on alleged juror misconduct. The court thus released the jurors' contact information and allowed them to be subpoenaed to appear at the hearing.

The trial court held the evidentiary hearing in May 2019. Jurors 6, 7, and 10 did not appear because they could not be located, but the remaining nine jurors appeared.

The trial court questioned each juror individually. Juror 1 recalled that the jury asked the trial court a question about a rap song, but was "not really sure" what the question was about because it had "been a long time." Juror 1 could not remember if the jury discussed the issue after the court responded to the jury's question. Juror 1 also could not recall the specifics of what the jury discussed about the rap song.

Juror 2 was the foreperson and "absolutely" remembered the jury's discussion about the rap song. Juror 2 could not remember which juror it was, but one of them said during deliberations, "I think that rap song came out after the incident." Juror 2

5

explained that because no one knew when the song was released, the jury "filled out one of those sheets" to request information from the trial court. Juror 2 recalled that the "sheet came back and said, If you didn't hear it during the trial, it's not admissible." After receiving the trial court's response, Juror 2 told the jury, "Please don't Google anything," and "that's where it ended." Juror 2 confirmed that the jury did not collectively discuss the issue further and she was not aware of anyone else discussing it individually.

Juror 3 said they recalled the line of the song discussed at trial was "'Crips, Hoovers, and Bloods.'" When the trial court asked if Juror 3 could recall the specifics of what the jury discussed about the rap song, Juror 3 was unsure, but thought someone mentioned "they knew that song and they didn't know when it came out and that was . . . pretty much it." Juror 3 did not recall the jury sending the trial court a question during deliberations or the court responding to one.

Juror 4 recalled a song being referenced during the trial, but did not remember any discussion about a song during the jury's deliberations. Juror 4 also did not remember the jury sending the trial court a question during deliberations.

Juror 5 likewise did not remember the jury sending the trial court a question or the trial court responding to one. Juror 5 only "[v]aguely" remembered a discussion about a rap song during deliberations. Juror 5 recalled that "there was a conversation" about a rap song, but could not remember any specifics.

6

Juror 8 had no recollection of the jury discussing a rap song or sending the trial court a question about the song during deliberations. But Juror 8 did remember the trial court responding to a question with, "If you didn't hear the evidence during the trial, you can't consider anything that wasn't presented in the courtroom."

Juror 9 remembered a discussion about a rap song and thought the line "'Hoovers, Crips, and Bloods'" sounded familiar. Juror 9 did not remember the jury sending a question to the trial court, but recalled the trial court sending a response to a question saying, "If you didn't hear it in the courtroom, you can't consider anything other than the testimony in the courtroom." Juror 9 did not remember any discussions about a rap song after the court's response and did not remember anything else about the issue.

Juror 11 remembered evidence that defendant was yelling "'Hoovers'" inside the lounge. Juror 11 also recalled the jury sending the trial court a question "to see if they can listen to the Hoovers song" and the trial court responding "[t]hat that wasn't [i]n the evidence." Juror 11 did not remember the jury discussing the rap song after the court's response.

Juror 12 remembered that "[t]he only thing" the jury discussed about the rap song was that one juror was not sure if it had been released before the shootings occurred. The jury then "sent the question [to the trial court] and then it was no part of the conversation after that." After the trial court responded, the jury did not discuss the rap song further because "[t]hat wasn't the basis of the evidence."

7

The trial court asked Juror 2 additional questions about which juror mentioned that the Hoover song may have come out after the shootings. Juror 2 remembered exactly who said it, and identified Juror 9 by his first name.

When asked what Juror 9 said, Juror 2 said the jury had the following discussion: "[Juror 9] goes, 'Does anybody here listen to rap music 'cause I listen to a lot of rap music?' [¶] And I go, 'Not me.' [¶] And he goes, 'I swear that song was more recent.' [¶] And everybody just kind of said, 'Don't know.' [¶] And he said, 'I'll Google it.' [¶] And I said, 'No, no. We're not Googling it.' I told him not to Google anything." Juror 2 then "filled out the sheet" and submitted it to the trial court, which responded, "'If it did not happen . . . in the trial'" . . . "'it's not to be considered during deliberation.'" Juror 2 read the court's response to the jury and "that was the end of it."

The trial court then asked Juror 9 follow-up questions. When asked whether it was him that mentioned during deliberations that the rap song might have been released after the shootings, Juror 9 said, "Maybe. Yeah." Juror 9 did not recall anyone saying they would Google it and noted "[w]e couldn't use our phones." When the court asked again whether Juror 9 recalled a discussion about looking up the rap song's release date, he said Juror 2 told everyone "we can't use our phones." Juror 9 never learned when the rap song was released.

Defendant filed a motion for a new trial based on juror misconduct. The trial court found that the jury committed misconduct by discussing whether the rap song had come out before the shooting because that information was not in evidence. But the court

8

found that the misconduct was not prejudicial.  The trial court reasoned that Juror 2's memory was "very good" and found her to be credible.  According to Juror 2's recollection, Juror 9 mentioned that he thought the rap song was released after the shootings and offered to Google it, but Juror 2 told him not to do so.  Juror 2 then asked the trial court for the rap song's release date, the court responded by directing the jury not to consider evidence outside of the record, and the jury followed that directive.  The court therefore found that the jury was not prejudiced by the misconduct because there was no evidence that the jury considered evidence not presented at trial in reaching their verdict.

2. *Analysis*

"'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry.  The court must first determine whether the affidavits supporting the motion are admissible.  [Citation.]  If the evidence is admissible, the court must then consider whether the facts establish misconduct.  [Citation.]  Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.'"  (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1467.)  Juror "misconduct gives rise to a presumption of prejudice, which 'may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.'"  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425.)

We generally review the trial court's ruling on a motion for a new trial for an abuse of discretion. (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.) "'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.'" (*People v. Danks* (2004) 32 Cal.4th 269, 303.) "However, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*Id*. at p. 304.)

We conclude the trial court properly denied defendant's motion for a new trial. Although no one disputes that the jury committed misconduct by discussing when the rap song was released, the record amply supports the trial court's finding that the misconduct did not prejudice defendant. (See *People v. Thomas* (2012) 53 Cal.4th 771, 819 [misconduct for juror to discuss evidence outside of the record].)

The foreperson, Juror 2, stated that she clearly remembered what transpired during the deliberations, and the trial court found her credible. As Juror 2 explained, Juror 9 said that he thought, but was not sure, that the rap song came out after the shootings. When he offered to Google the song's release date, Juror 2, as foreperson, directed him not to look into it. According to Juror 2, she asked the trial court when the song was released, the court responded that they were limited to the evidence presented at trial, and "that was the end of it." Although Juror 9's conduct was improper, the trial court did not err in finding that his misconduct was not prejudicial. The trial court reasonably found that there was no evidence that the jury's brief discussion about the rap song's release

10

date influenced their decision-making in any way. Any potential prejudice was also dispelled by the trial court's directing the jurors not to consider evidence outside of the record and the jurors' consistent statements that they did not rely on extra-record evidence in reaching their verdict. (See *People v. Avila* (2009) 46 Cal.4th 680, 727 [no prejudicial misconduct where jury's discussion "was not of any length or significance" and "the offending juror was immediately reminded he could not consider [defendant's failure to testify] and the discussion ceased"].) We therefore conclude the trial court properly denied defendant's motion for a new trial.

B. *Gang Enhancements*

Defendant contends there was insufficient evidence for the jury to find the gang enhancements true. He claims there was not substantial evidence that he committed the murders for the benefit of, at the direction of, or in association with any criminal street gang or that he intended to promote or benefit his gang when he committed the murders. We disagree.[2]

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

---

[2] For the reasons discussed below, we vacate the jury's true findings on the gang enhancements and remand the matter for retrial. We still address whether substantial evidence supports the gang enhancements because the People may not retry defendant if substantial evidence does not support the jury's true findings on the enhancements. (See *Hudson v. Louisiana* (1981) 450 U.S. 40, 44.)

defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We may reverse a conviction for a lack of substantial evidence only if it appears "'"that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

To find the gang allegations true, the jury had to (1) find that defendant committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang" and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)[3]

Here, there was substantial evidence from which the jury could reasonably find both prongs were satisfied. Defendant is an admitted Hoover Criminals street gang member. There was evidence that defendant "kept yelling out 'Hoover'" in the lounge and performed the Hoover Stomp, a dance move that identified him as a member of the gang.

D.F. testified that immediately before shooting Freeman, defendant said "Hoover." Although defendant denied doing so, he did not deny shooting Freeman because he felt disrespected because he thought Freeman was laughing at him.

A gang expert testified for the prosecution. The prosecutor asked the expert about a hypothetical scenario that largely tracked the witnesses' testimony about defendant's behavior inside the lounge and his offenses. The prosecutor asked the expert, "[L]et's say that you have an active member of the Hoover Criminals street gang . . . at a lounge. In that lounge, the Hoover Criminal is yelling out 'Hoover' while inside the lounge.

---

[3] As explained below, section 186.22 was recently amended and imposes new requirements for gang enhancements.

Someone else is yelling out 'f—k Naps.'[4] [¶] The Hoover Criminal goes out into the parking lot . . . and sees an individual, that the Hoover Criminal feels like who is laughing at him, being disrespectful to him. [¶] At that point, the Hoover Criminal takes out a firearm, points it at the individual and then yells 'Hoover' and then murders the individual and two others." The expert testified that in that hypothetical, the Hoover member would have been acting in association with the Hoover gang because "he's associating himself right before" the shooting by yelling "Hoover." The expert further testified that the hypothetical Hoover member would have been benefitting and promoting the Hoover gang because the shooting would urge witnesses to fear and respect the gang.

From this evidence, the jury could reasonably find that defendant murdered the victims "for the benefit of, at the direction of, or in association with any criminal street gang" and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048 ["'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support [a] gang enhancement."]; *People v. Albillar* (2010) 51 Cal.4th 47, 66 ["[T]he scienter requirement in section 186.22(b)(1)— i.e., 'the specific intent to promote, further, or assist in any criminal conduct by gang

---

[4] "Naps" is a derogatory term for Hoover's main rival gang. A witness told police she heard someone yelling "f—k [N]aps" inside the lounge, but did not say whether it was defendant.

members'—is unambiguous and applies to *any* criminal conduct."].)  Substantial

evidence thus supports the jury's true finding on the gang enhancements.

C.  *Fine and Fees*

Defendant argues the trial court impermissibly imposed a $10,000 restitution fine

(§ 1202.4) and $210 in fees (§ 1465.8; Gov. Code § 70373) without holding a hearing to

determine his ability to pay them.[5]  He also contends his trial counsel was ineffective for

failing to object to the fine and fees.

The trial court may impose a restitution fine even if the defendant cannot pay it.

(*People v. Potts* (2019) 6 Cal.5th 1012, 1056.)  The court should also consider "the

seriousness and gravity of the offense and the circumstances of its commission, any

economic gain derived by the defendant as a result of the crime, the extent to which any

other person suffered losses as a result of the crime, and the number of victims involved

in the crime.  Those losses may include pecuniary losses to the victim or his or her

dependents as well as intangible losses, such as psychological harm caused by the crime."

(§ 1202.4, subd. (d).)  Inability to pay is only one " factor for the court to consider in

setting the amount of a restitution fine, alongside 'any relevant factors.'" (*People v.*

*Potts*, at p. 1056.)  "The court was permitted to conclude that the monetary burden the

---

[5] The People assert defendant forfeited the argument by failing to object to the fine and fees.  We exercise our discretion to address the issue on the merits "to avert [defendant's] claim of inadequate assistance of counsel." (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310.)

restitution fine imposed on defendant was outweighed by other considerations." (*Id*. at pp. 1056-1057.)

Given that defendant shot and killed three people for some perceived slight, the trial court could have reasonably found that the maximum $10,00 restitution fine was appropriate irrespective of defendant's inability to pay the fine because of the gravity of the murders and the suffering they caused the victims' families. The trial court thus did not err in imposing the $10,000 restitution fine without deciding whether defendant could pay it or holding an ability-to-pay hearing. Defendant's counsel therefore was not ineffective for failing to object to the fine, as any objection may have been fruitless.

As for the $210 in fees, even if defendant's counsel was ineffective for failing to object to them, and even if the trial court erroneously failed to hold a hearing on whether defendant has the ability to pay them, any error was harmless beyond a reasonable doubt. Defendant was sentenced to life without the possibility of parole, and there is no evidence he cannot work while serving his sentence.

We thus assume defendant will obtain a prison job paying the minimum of $12 per month. (See Cal. Code. Regs., tit. 15, § 3041.2.) We also assume the $10,000 restitution fine will remain outstanding, which will leave defendant with $5.40 per month to settle the $210 in fees. (*People v. Taylor* (2019) 43 Cal.App.5th 390, 402.) At that rate, defendant will pay off the fees in 38 months into his life sentence. Thus, he "will have sufficient time to earn [$210] during his sentence, even assuming [he] earns nothing more than the minimum." (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.)

16

We therefore conclude defendant will be able to pay the $210 in fees. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [court may consider defendant's future earnings in prison and after release in determining defendant's present ability to pay]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [a trial court may consider the defendant's future ability to pay, including his ability to earn wages while in prison]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [defendant sentenced to prison did not show absolute inability to pay $10,000 restitution fine even though prison wages would make it difficult for him to pay the fine, it would take a very long time, and the fine might never be paid].) On this record, any error as to the $210 in fees was harmless beyond a reasonable doubt. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035.) As a result, we reject defendant's claim that his counsel was ineffective for failing to object to those fees. (See *People v. Hart* (1999) 20 Cal.4th 546, 624 [to establish ineffective assistance of counsel "'prejudice must be affirmatively proved'"].)

D. *Remand of Gang Enhancements*

Defendant argues, and the People concede, that the gang enhancements must be vacated and the matter remanded for retrial under recently enacted Assembly Bill No. 333 (AB 333). We agree.

Section 186.22 enhances the punishment of a person convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal

17

conduct by gang members." (§ 186.22, subd. (b)(1), (4).) AB 333 amended section 186.22 in several ways. (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822 (*Rodriguez*); *People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).) Among other things, AB 333 increased the threshold for conviction and imposition of gang enhancements. (*Rodriguez, supra*, at p. 822 ; *Lopez, supra*, at p. 345.) "Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. [Citation.] Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses. [Citation.] In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang "members,' and must have been for the 'common[] benefit[] [of] a criminal street gang.' [Citation.]" (*People v. Sek, supra*, 74 Cal.App.5th at p. 797.)

Defendant argues, the People concede, and we agree that the amendments could benefit defendant and thus AB 333 applies retroactively to defendant's case. (*Rodriguez, supra*, 75 Cal.App.5th at p. 822; *Lopez, supra*, 73 Cal.App.5th at p. 345.) The parties also agree, as do we, that the appropriate remedy is to remand the matter to give the People an opportunity to retry the gang enhancement allegations under the new law. (*Lopez*, at p. 345; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2; *People v. Sek, supra*, 74 Cal.App.5th at p. 801.)

E.  *Retrial*

Defendant contends the trial court erroneously denied his request to bifurcate the trial on the underlying offenses from the gang enhancements.  He argues that a new statute enacted by AB 333 requires trial courts to grant such a bifurcation request and that the statute applies retroactively.  We agree, but conclude the trial court's failure to bifurcate the proceedings was harmless.

AB 333 added section 1109, which allows the defendant to request a bifurcated trial when there is a gang enhancement allegation.  (§ 1109, subd. (a); *People v. Sek*, *supra*, 74 Cal.App.5th at pp. 797-798.)  If the defendant so requests, the trial court must try the case in two separate phases:  (1) The question of the defendant's guilt of the underlying offense shall be first determined," and then "(2) If the defendant is found guilty of the underlying offense and there is [gang enhancement allegation], there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a); *People v. Sek*, *supra*, 74 Cal.App.5th at pp. 797-798.)

Defendant contends section 1109 is an ameliorative change in the law that should apply retroactively to his case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and requires reversal of his convictions and retrial on the offenses.  The People argue section 1109 applies prospectively only and that any error in not bifurcating the proceedings was harmless in any event.

The courts of appeal are split on whether section 1109 applies retroactively. The Sixth District (in a split decision) and the Fifth District have held that section 1109 applies retroactively under *Estrada*. (*People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022 (S274743); *People v. Ramos* (2022) 77 Cal.App.5th 1116.) A different panel of the Sixth District and the Second District, Division Three have held that the statute applies prospectively only. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, review granted Aug. 17, 2022 (S275341); *People v. Perez* (2022) 78 Cal.App.5th 192, review granted Aug. 17, 2022 (S275090).

We need not decide the issue because we conclude any failure to bifurcate the proceedings was harmless. We therefore assume without deciding that section 1109 applies retroactively. *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [assuming without deciding that section 1109 applies retroactively].)

The People argue that even if section 1109 applies retroactively, the trial court's failure to bifurcate the proceedings was harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). In his supplemental opening brief, defendant did not address whether the trial court's failure to bifurcate the proceedings was harmless. In his supplemental reply brief, defendant did not dispute that the *Watson* standard applies.

After we issued a tentative opinion noting defendant's position, he requested and we granted him the opportunity to file a supplemental letter brief addressing the appropriate harmlessness standard. In that brief, defendant notes there is a split among the courts of appeal as to which standard to apply. The Sixth District in *Burgos* applied

20

the *Chapman* beyond-a-reasonable-doubt standard because the failure to bifurcate "likely" qualifies as structural error. (*People v. Burgos*, *supra*, 77 Cal.App.5th at p. 568.) Three other courts, including this court, have applied the *Watson* standard. (See *People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1131; *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480; (*People v. Montano* (2022) 80 Cal.App.5th 82.) We respectfully disagree with *Burgos* that the failure to bifurcate under section 1109 amounts to structural error that requires reversal unless the error was harmless beyond a reasonable doubt. We therefore will apply the *Watson* standard. (See *People v. Ramos*, *supra*, at p. 1131, fn. 7; see also *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [holding any error in failing to bifurcate under section 1109 was harmless under *Watson* standard].)

Under that standard, defendant must show that it is probable that he would have received a better outcome had the trial court bifurcated the trial on the underlying offenses from the trial on the gang enhancements. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) He has failed to do so.

To begin with, the evidence that defendant was guilty as charged was strong. Defendant admitted that he shot the victims, but claimed he did so in self-defense. The gang evidence did not prejudice defendant because he relied on it to support his claim of self-defense. Defense counsel argued defendant acted in self-defense in part because two of the victims were gang members. "Thus, it is likely some, though not all, of the evidence of [defendant's] gang membership . . . would have come in at a trial on just the substantive offenses." (*People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1131-1132; see also

21

*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 ["To the extent evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"].) The jury also was instructed not to consider evidence of defendant's gang membership when deciding whether he was guilty of the murder charges and finding whether the non-gang-related enhancements were true. We presume the jury followed that instruction, which further supports our conclusion that the trial court's failure to bifurcate the proceedings was not prejudicial. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

IV.

DISPOSITION

The true findings on the section 186.22 gang enhancements are vacated. The prosecution may elect to retry the gang enhancements. The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

FIELDS

J.

22